Lloyd L. HAYES, Hayes, Inc., et al.,
Plaintiffs-Appellees,

v.

T. G. SOLOMON, Gulf States Theatres,
Inc., et al., Defendants-Appellants.

No. 77–1062.

United States Court of Appeals,
Fifth Circuit.

June 29, 1979.

D. L. Case, Jack Pew, Jr., Dallas, Tex., O. J. Weber, Beaumont, Tex., John R. Vaughan, William T. Lifland, Marshall H. Cox, Jr., Robert T. Quinn, New York City, Hopkins P. Breazeale, Jr., Baton Rouge, La., for defendants-appellants.

James A. Chesnutt, II, John G. Tucker, Beaumont, Tex., Edwin Tobolowski, Neal E. Young, David L. White, Dallas, Tex., for plaintiffs-appellees.

Before THORNBERRY, RONEY and HILL, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Although this appeal presents a Brobdingnagian record which is typical of quests for the golden fleece of treble damages, this is not a typical antitrust case. Indeed, this is not even an atypical antitrust case; for, despite plaintiffs' herculean efforts, we conclude that this is not an antitrust case at all.[1] We write at some length to explain why we conclude that the evidence was

---

1. On our own travels through the record and the applicable law, we have been greatly aided by the efforts of counsel.

*insufficient* to support the judgment, entered on the jury's verdict, of $10,449,900 and the attorney's fees award of $625,000 after considering: 2449 pages of trial transcript; 1911 pages of record on appeal; several cartons of depositions; scores of charts, photographs and exhibits; 201 pages of briefs; and extensive oral argument. Though there is an abundance of evidence, there is simply not enough evidence of an antitrust violation.[2] We reverse and remand.

## I.  PROCEDURAL BACKGROUND

This is an appeal from a judgment rendered on a jury verdict in a private antitrust action charging violations of both Section 1 and Section 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, with respect to alleged restraints upon the motion picture exhibition business in Port Arthur, Texas. The action was instituted by three separate groups of plaintiffs against each of several defendants, seeking treble damages under Section 4 of the Clayton Act, 15 U.S.C.A. § 15.  The case was tried before a jury in the United States District Court for the Eastern District of Texas. Although brought as a single action, this case resulted in three separate damage awards by the jury, each in favor of a different plaintiff or plaintiffs.

### A.  *The Parties*

Though brought as a single action, this case involves several actors.

Plaintiff Lloyd L. Hayes (Hayes), an ex-mayor of Port Arthur, is a former employee, business associate and family friend of defendant T. G. Solomon (Solomon), an entrepreneur who had theatre interests in that area of Texas up to August 31, 1972, and later became an officer in the corporations which purchased such interests. This case revolves around Hayes and Solomon.

Plaintiff Hayes, Inc. is a Texas corporation, all the stock of which was owned at the time of trial by Hayes and his family. Plaintiff Park Plaza Twin Theatres, Inc. is a Texas corporation which owns the Park Plaza Twin Theatre in Port Arthur and whose stock at the time of trial was owned by Hayes, Inc. and by a trustee for the widow of Hayes's former partner. Plaintiff Mid-County Enterprises, Inc. is a Texas corporation wholly owned at the time of the trial by Hayes, Hayes's father, and Gillis Jim deNeve, another former employee of Solomon who subsequently went into business with Hayes.

Defendant Fuqua Industries, Inc., is a publicly held Delaware corporation engaged in various businesses involving recreation, transportation, and shelter. Defendant Gulf State Theatres, Inc. is a Delaware corporation wholly owned at the time of trial by Fuqua Industries, Inc.; subsequent to the institution of this action, its name was changed to Coastal Theatres, Inc. Defendant Gulf States Theatres of Texas, Inc. is a Delaware corporation whose stock at the time of trial was wholly owned by Fuqua Industries, Inc.; subsequent to the institution of this action its name was changed to Martin Theatres of Texas, Inc. Both Gulf States Theatres, Inc. and Gulf States Theatres of Texas, Inc. were formed to acquire Solomon's theatre interests on August 31, 1972.

### B.  *The Claims*

Following a nine day trial in September of 1976, during which 283 exhibits were introduced and 24 witnesses testified, the jury found that the defendants had entered into an illegal contract, combination or conspiracy to unreasonably restrain the trade or commerce of motion picture exhibition in the greater Port Arthur, Texas area. The jury further found that the defendants had monopolized, attempted to monopolize or conspired to monopolize the motion picture exhibition business in the greater Port Arthur, Texas area. The various legal relationships among these actors resulted in three separate damage awards by the jury.

Of the three awards, the largest was on a "shopping center claim" brought by plaintiffs Hayes and Hayes, Inc. That claim

---

2.  "Enough is abundance to the wise."  Euripides: *The Phoenissae.*

grew out of an aborted venture to develop a shopping center in Port Arthur. The jury awarded damages of $3,000,000, before statutory trebling, against all four defendants, based on the increased costs since 1972 of constructing a $14,000,000 shopping center, despite the facts that the only alleged antitrust violation was the prevention of the construction of a theatre which would have been merely one tenant of the proposed shopping center, and no actual construction costs were ever incurred.

A second award was based on the "Mid-County claim." Plaintiff Mid-County Enterprises, Inc., a corporation partly owned by Hayes, alleged that the "threats" of the defendants kept that plaintiff from building and operating a drive-in theatre in Port Arthur. The jury awarded damages of $258,300, before statutory trebling, against all four defendants.

The remaining award related to the "Park Plaza claim." Plaintiff Park Plaza Twin Theatres, Inc., a corporation partly owned by Hayes, Inc., charged that a motion picture theatre owned by it was unfairly treated during the period its theatre was operated, under a lease, by one of the corporate defendants which renovated two other theatres it owned in the same area and allocated some of the best films to one of the renovated theatres. The jury awarded damages of $225,000, before statutory trebling, against all four defendants.

The judgment entered on the jury verdict totaled $10,449,900 trebled damages plus $625,000 attorneys' fees.

## II. FACTUAL BACKGROUND

On appeal, defendants raise fifteen separate issues. Before deciding those issues necessary to our result, we shall endeavor to detail the facts.

### A. *Hayes and Solomon: the Initial Business Relationship*

Hayes and Solomon first crossed paths in 1967. At that time, Hayes was mayor of Port Arthur, Texas, a position he held from May 1963 to April 1969. In 1967 Hayes and W. Bonner Phares, a local investor, organized Park Plaza Twin Theatres, Inc. to construct the Park Plaza Theatre in Port Arthur. Designed as a deluxe two-auditorium first-run theatre, the Park Plaza Twin Theatres were soon to become acknowledged as the finest such facility in the area.

Hayes and Phares set about to find an experienced theatre operator to assist them. They were introduced to Solomon's then employee, Gillis Jim deNeve. deNeve reported to Solomon that Hayes and Phares had begun building the Park Plaza Twin Theatres and were seeking connections with an operating company; he wrote that the two ". . . have investigated us fully and would like very much for us to take over and give us the opportunity to buy in and give them the opportunity to buy in with us and go anywhere in Texas with their participation." deNeve also reported that Hayes and Phares had already held discussions with representatives of the Gordon family which had other theatre holdings in the area.

Hayes, Phares and Solomon met in late 1967 and discussed the possibility of combining their theatre interests in Port Arthur and Beaumont and purchasing the Gordon family's theatre holdings. Solomon agreed with Hayes and Phares to become the sole operator of the Park Plaza Twin Theatres along with a theatre he owned in Beaumont. Later, the three formed a corporation which they named after the "Golden Triangle" (Beaumont, Orange and Port Arthur, Texas) and which acquired the Gordon family's theatres in July of 1968. The stock in this corporation, Golden Triangle Theatres, Inc., was owned 25% by Hayes, 25% by Phares and 50% by Solomon. Solomon also undertook to operate the theatres owned by Golden Triangle Theatres, Inc. Solomon, Hayes and Phares also agreed not to sell Golden Triangle Theatres, Inc. stock to outside interests without giving the corporation a right of first refusal. Upon the death of either Hayes or Phares the survivor was to have a 30-day right to acquire the decedent's stock before the corporation's right of first refusal came into being.

During this period, the personal and business relationships between Hayes and Solomon became extremely close. After Hayes completed his last term as mayor of Port Arthur in April of 1969, he left town and went to New Orleans, where Solomon had established his own home office. Hayes soon became Solomon's assistant, with the title of vice-president and a salary of $50,000 a year. His office was next to that of Solomon. Solomon was grooming Hayes to succeed him and named Hayes executor of his will and trustee of a trust for his children. Solomon lent Hayes $60,000 and agreed to lend him another $60,000 to assist Hayes and Hayes, Inc. in meeting their financial obligations under bank loans obtained to purchase land in Port Arthur.

Phares died on July 2, 1970. After some maneuvering, Hayes purchased Phares's stock in Golden Triangle Theatres, Inc. for a $70,000 promissory note payable over 7 years. Solomon's belief that Hayes had deceived him in connection with this purchase eventually caused Hayes and Solomon to part company in May of 1971.

Hayes knew that his opportunity to buy Phares's stock in Golden Triangle Theatres, Inc. free of the corporation's first refusal right lasted only 30 days after Phares's death. He first broached the subject of purchasing the Phares' stock to Mrs. Phares on the very day Phares died. At first, Mrs. Phares was somewhat reluctant to sell. She asked to see the stockholders' agreement, and, when approached the day after her husband's death, told Hayes that she did not want to sell but wished to hold the stock for her children, if it were at all possible. She also told Hayes that, if she had to sell the stock, she would sell it to Hayes personally and not to Hayes, Inc. or Solomon. Hayes and Mrs. Phares testified that they eventually reached an oral agreement of purchase around the middle of July 1970.

Hayes did not tell Solomon of this agreement until November of 1970, however, when the agreement was embodied in a written instrument which Hayes asked Solomon to sign. The instrument acknowledged Hayes's right to acquire Phares's stock. Solomon testified that he was not then aware that Hayes's right to preempt the corporation's right of first refusal lasted only 30 days from Phares's death, and that signing the instrument would waive any right to dispute the timeliness of the preemption. Still, Solomon was somewhat reluctant to sign the instrument. Solomon knew that Phares's estate was in poor financial condition and Hayes himself was deeply in debt and that Solomon's own credit had become the major financial prop for Golden Triangle Theatres, Inc. For these reasons, Solomon thought it would be fairer to divide the Phares stock between himself and Hayes according to their proportionate interest in the corporation; then, Solomon would hold a majority interest. Nevertheless, after some disagreement, Solomon eventually signed the instrument.

### B. *The Shopping Center Venture*

Before the disagreement over the Phares stock, Hayes and Solomon had begun another business venture. This venture ultimately gave rise to the "shopping center claim."

While Hayes was mayor of Port Arthur, his family had assembled a tract of land in Port Arthur of approximately 1,400 acres. The purpose of assembling the tract was to build a large-scale residential development for some 13,000 residents with ancillary commercial facilities. Hayes started talking with Solomon about developing the 1,400 acres in the Spring and Summer of 1970. He showed Solomon a proposed letter to potential investors extolling the quality of the 1,400 acres for development, and Solomon expressed his interest. The banks from which Hayes and Hayes, Inc. had previously borrowed funds to finance the land purchases were pressuring Hayes to return to Port Arthur and personally tend to the development, if he could not convince Solomon to make a heavy commitment to the project. Partly in order to keep Hayes working for Gulf States Theatre, Inc. in New Orleans, Solomon agreed to help Hayes try to develop a regional shopping center on 90 acres of the tract. At Solo-

mon's own suggestion, he and Hayes sought out Wilbur Marvin, an experienced shopping center developer with whom Solomon had developed other shopping centers, to join the venture. Solomon offered his financial backing and the expertise of Marvin as a perfect combination to make the regional shopping center a success. On September 8, 1977, Marvin wrote Solomon that he would participate in return for a development fee of $25,000 *per annum.* Later in September, however, Marvin developed some qualms. He had found significant discrepancies between the actual condition of the land and its description as originally provided by Hayes. Part of the incentive for Marvin and Solomon to become involved in the deal was Hayes's offer to allow them to purchase an interest in the land at a substantial discount from its true value. Marvin telegraphed Solomon in New York that an independent survey failed to substantiate the $15,000 to $18,000 per acre valuation; a range of $7,500 to $10,000 was more accurate. He added:

> Ten year Port Arthur population growth negative.

> Shopping Center development at this location definitely long term and directly related to development of large desolate looking area adjacent. Residential development in these areas are dependent upon long range expensive drainage, sewage and flood control programs.

> Feel that we are in effect making an all cash purchase of 90 acres at top appraised value today's market.

> Sears taking 10,000 sq. ft. in existing Nederland Shopping Center.

This was much different than what had been represented, especially concerning the value of the land. In concluding his telegram to Solomon, Marvin suggested the entire deal be shelved for six months, but added that if Solomon wished to go forward for other reasons, Marvin would join, if he had Solomon's personal assurance that Solomon would "take him out" in six months on request. Two days later, Marvin wrote his attorney in a similar vein, adding that in response to Marvin's telegram Solomon had expressed the view that "there was no deliberate overrepresentation by Hayes." Marvin also wrote that his "personal evaluation of the situation at this point would be that in all probability a deal will proceed, with the same principals, 'for a smaller amount of acreage, and perhaps at an adjusted price."

Marvin's evaluation was correct. A memorandum which he wrote for his file in November of 1970 records that the parties agreed to reduce the size of the development from 90 to 60 acres and that the Hayes interests would receive $300,000 from Solomon and Marvin for a half interest in the 60 acres. The memorandum also stated that Marvin was to have an option to terminate and be made whole after the first year. Finally, the memorandum emphasized: "the point was made abundantly clear that the progress of development of this project was dependent in large measure on the rapidity of development of the property adjacent by the Hayes group."

### C. The Development Agreement

On November 27, 1970, Hayes, Hayes, Inc., Solomon and Marvin executed a Development Agreement creating a joint venture among the four to develop a regional shopping center [3] on the 60-acre tract. Hayes signed as a guarantor of the obligations of Hayes, Inc. Hayes, Inc. agreed to transfer an individual one-quarter interest in the 60 acres to each of the other co-venturers. Solomon and Marvin shortly thereafter each paid $150,000 in return for deeds conveying an undivided one-half interest in the land. Though the Development Agreement did not assign specific responsibilities to

---

**3.** Expert testimony at trial defined a "regional shopping center" as one containing two or more national retailers, *i. e.,* anchor tenants, each operating stores of 100,000 square feet or more and numerous other small retail stores, which serves a community of 200,000 or more people. Expert testimony also disclosed that of the various types of shopping centers a regional center is the largest and most difficult to develop and, as a rule, developing one is an onerous, time-consuming, long-range project.

Hayes and Hayes, Inc., Marvin and Solomon were assigned specific roles. Marvin was to use his best efforts to develop the shopping center. Solomon was to make periodic infusions of capital as the development progressed; he agreed to use his credit to borrow $500,000 for the venture and was to lend $100,000 for initial expenses. During 1972, Marvin had the option to terminate his participation in the development and sell his interest to Solomon for $150,000. As a further condition, Solomon and Marvin required Hayes, Inc. to execute a written agreement prohibiting it from developing any other property within a 2 mile radius for a similar purpose.

### D. *Marvin's Efforts*

Beginning in January of 1971, Marvin set out to interest prospective tenants in the proposed shopping center. Notwithstanding Hayes's own conclusional testimony that Marvin's efforts produced "a lot of results" in terms of interest on the part of prospective tenants, the specifics of Marvin's testimony and the documentary evidence indicate that only one actual expression of interest was obtained—from White House Dry Goods Company—and the amount of space which was involved, 40,000 square feet, was too small for that company to qualify as an anchor tenant.

Marvin met with a representative of the J.C. Penny Company who furnished him with printed, standard prototypes of a store plan and a layout. But the representative told Marvin that his company already had a store in Port Arthur, had no present plans to relocate or expand, would not require further space for three or four years and even then would require that the developers also obtain another major tenant. As the plaintiffs themselves point out in their brief, Marvin himself minimized the significance of this contact, during his trial testimony. Marvin was unable to generate any other expressions of interest of any kind. W.T. Grant Company had already committed itself to a nearby area, and, although Marvin thought he perceived some interest on the part of a discount division of the Walgreen Company, the J.C. Penny Company indicated that it would not be interested in being a co-tenant with that division. Marvin contacted a representative of Sears, Roebuck & Company who offered no encouragement at all and pointed out that his company had recently made a commitment to new space a short distance away. Marvin also contacted Federated Department Stores and two or three other prospective users of large space, but was unable to generate any interest.

During the same period, Marvin made initial contacts with a number of Dallas-based architectural firms about the design of the proposed shopping center. One of these firms, Architectonics, Inc., which had many years of regional shopping center design experience, sent a letter in April of 1971 outlining a general approach to the project and followed up with a general proposal, limited in extent to the development of preliminary plans, in June. No definitive plans were ever drawn. After Hayes and Marvin had met with a representative of Architectonics, Inc., Marvin transmitted the general proposal to Solomon for his consideration. Solomon never approved the proposal, and Marvin would not proceed without it. Marvin's efforts at development had reached an impasse because of a falling-out between Hayes and Solomon.

### E. *Hayes and Solomon: the Falling-out*

During the period of Marvin's preliminary development efforts, differences between Solomon and Hayes over Hayes's acquisition of the Phares stock, already discussed above, became greatly intensified. In May of 1971, Solomon proposed that the Phares stock be transferred to Golden Triangle Theatres, Inc. and that the corporation assume Hayes's liability to the Phares Estate. This proposed reconveyance would have given Solomon 66⅔% ownership of Golden Triangle Theatres, Inc. Hayes refused and Solomon became convinced that he had been deceived by Hayes concerning the Phares stock. The differences between Hayes and Solomon could not be resolved and they parted company; Hayes left New Orleans and Solomon's employ.

In a file memorandum dated June 4, 1971, Marvin referred to the "very strong falling-out" which had occurred between Solomon and Hayes over the Phares stock. The memorandum noted that Solomon had informed Marvin that he "wanted out" of the shopping center project, but was agreeable to Marvin's continuing in the project with Hayes. At this juncture, Solomon withheld his own further support for the development. Consistent with his desire to take himself out of the deal, Solomon did not approve the commitment to Architectonics, Inc. Hayes himself confirmed to Marvin that the falling-out had occurred and indicated he wanted to continue with the project.

Marvin was still hopeful in August of 1971 that the Solomon-Hayes dispute would be resolved, but his enthusiasm for the shopping center venture was diminished by the lack of any real interest on the part of the prospective tenants and the failure of Hayes to move forward with the residential development of the remainder of the 1,400-acre tract. As has already been discussed, Marvin had some fruitless discussions with prospective tenants which had been initiated earlier, but he undertook no further work on the project after September of 1971. During September, Marvin heard that Hayes was making an effort to buy Solomon out and he asked if Hayes still wished him to continue. Hayes made no response. In November, Marvin asked Solomon to take him out of the joint venture in accordance with the Development Agreement.

As we shall detail later, in the last part of 1971 and in the early part of 1972, Solomon, Hayes and Hayes, Inc. were unraveling their respective obligations and responsibilities under the Development Agreement. By February of 1972, Hayes and Hayes, Inc. were the only parties still interested in the shopping center development, and nothing in the record suggests that Solomon or any of the other defendants had any knowledge of their plans. During that same month, Hayes attended a shopping center convention where he spoke with a friend-advisor, Bob Ort, about going ahead with a shopping center. Ort advised Hayes that he should have a plan to present to prospective tenants, as Marvin had suggested one year before. Architectonics, Inc. was then asked to submit another proposal for Hayes and Hayes, Inc. similar to the one submitted to Marvin, Solomon, Hayes and Hayes, Inc. when the Development Agreement was still in effect. The March 23, 1972, proposal of Architectonics, Inc. followed; it was virtually word-for-word the same proposal that had been sent to Marvin on June 23, 1971. The second proposal was never acted upon.

There is some testimony that Hayes looked for another partner to replace Solomon in the shopping center venture, but there is no evidence that one was ever found. There is no evidence that he ever located any prospective major tenants, although their participation was essential to a successful shopping center. Nor was there any evidence that he ever arranged financing for a shopping center—which would hardly have been forthcoming without such prospective tenants.

Hayes apparently put the shopping center venture to one side while he pursued other business ventures. These ventures included his large scale residential development, complete with a shopping center, for which he had been seeking federal financing for several years without success. The proposed regional shopping center, however, was never built. The property looked substantially the same at the time of trial as it did in 1970. The adjacent desolate 1,400-acre area, the development of which Marvin deemed essential preparation for getting the shopping center out of the ground, remained mostly undeveloped at the time of trial. Nevertheless, plaintiffs introduced evidence of what the 60-acre tract might have been like if Hayes and Hayes, Inc. had built a shopping center in 1972. This evidence included plans, a table model of a complete shopping center and a hypothetical list of tenants, all prepared in 1975 and 1976 for use at trial.

### F. Hayes and Solomon: Efforts at Disentanglement

In order to understand fully the three claims made by plaintiffs, it is necessary to

review briefly the parties' efforts to unravel their various business arrangements.

After the 1971 break-up with Hayes, Solomon negotiated to sell his theatre properties to the Holiday Inn Corporation. Solomon was informed that he had too many partners in his various theatre projects, but prospects for their purchase would be improved if he converted his theatre interests into wholly owned interests by buying out his partners or, if necessary, selling out his interests. Solomon then began to restructure and consolidate his interests, including the outstanding business arrangements with Hayes. These efforts were joined in by Hayes, who also wanted to dissolve their various business arrangements. In particular, Hayes became very dissatisfied with the Golden Triangle Theatres, Inc. arrangement, since Solomon exercised complete control despite Hayes 50% interest. Further, he was anxious to resolve the impasse reached on the shopping center development. A meeting was held on November 29, 1971. According to Hayes's own testimony, Solomon told him that he wanted to buy out Hayes's interests but not for personal reasons. Solomon told him that he was treating Hayes like the rest of his partners; he just needed to consolidate his theatre ownership to make the sale. Regarding their falling-out over the Phares stock, Solomon said he was sorry it had happened and admitted that it was as much his fault as anyone else's.

After considerable hard negotiations, Solomon and Hayes reached some accord, though later Hayes would claim that the leverage Solomon exerted violated the antitrust laws. On December 10, 1971, the parties entered into two agreements to separate their business arrangements. The first was entitled "Memorandum of Agreement"; the second was entitled "Memorandum of Understanding."

The Memorandum of Agreement dealt with matters other than the shopping center venture. In January of 1972, to implement this Memorandum: (1) Hayes was paid $750,000 for his 50% interest in Golden Triangle Theatres, Inc. which included the 25% that Hayes had bought for $70,000 from Phares's widow the year before; (2) the balance of the $175,000 Hayes and Phares had loaned Golden Triangle Theatres, Inc. was paid, and Solomon indemnified Hayes against any liability as coguarantor of the corporation's $1,000,000 in notes; (3) Park Plaza Twin Theatres, Inc. leased its theatre to Golden Triangle Theatres, Inc. for a renewable 10-year term on a percentage lease with a $72,000 annual minimum; (4) the joint operating arrangement covering the Park Plaza Twin Theatres, Inc. and Solomon's Beaumont Theatres, Inc. was ended; (5) Solomon agreed to pay Hayes $500 per month for five years to serve Golden Triangle Theatres, Inc. as a consultant and representative who would "not be required to render any specific duties, but recommend action beneficial to said theatres."

The Memorandum of Understanding dealt with the shopping center venture. It was executed by Solomon, acting for himself and for Marvin, and by Hayes, acting for himself and for Hayes, Inc. Their expressed intent was to cancel the Development Agreement, "releasing each other from all the terms and conditions and holding each other free and harmless in connection therewith." Solomon gave Hayes and Hayes, Inc. the right to repurchase at the original purchase price, $300,000, the undivided one-half interest in the 60 acres which Solomon and Marvin had acquired pursuant to the Development Agreement. Hayes and Hayes, Inc. undertook to make such purchase within three years. The $300,000 purchase price could be paid either in cash at purchase or $100,000 down and $200,000 in interest-bearing notes payable over four years.

On January 13, 1972, the parties entered into three other agreements to implement the Memorandum of Understanding: (1) "Amendment to Memorandum of Understanding"; (2) "Agreement of Cancellation"; (3) "Option and Agreement to Purchase." The Amendment to Memorandum of Understanding declared that the Memorandum of Understanding would become

effective and self-operating on March 1, 1972. The Agreement of Cancellation provided that the Development Agreement was "cancelled and annulled and of no further force and effect and that each of the parties hereto hereby are released from all the terms and conditions of said Contract." The Option and Agreement to Purchase obligated Solomon to sell his and Marvin's undivided one-half interest in the 60 acres to Hayes and Hayes, Inc. and required them to buy within three years.

These agreements were designed to make it possible for Hayes and Hayes, Inc. to proceed on their own in the development of the proposed shopping center. As it turned out, a dispute arose over the effect of this second series of three agreements, due, in large part, to Solomon's failure to obtain Marvin's prompt concurrence with the arrangements. Hayes and his lawyer, however, had no doubt about what they had accomplished, i. e., that the Amendment to Memorandum of Understanding, setting the effective date on March 1, 1972, bound Solomon to the three-year option himself whether or not Marvin ever signed the Agreement of Cancellation or the Option and Agreement to Purchase.

## G. The Shopping Center Claim

In their complaint, plaintiffs alleged that, but for defendants' conduct, Hayes and Hayes, Inc. "would have succeeded in developing a substantial regional shopping center" which would have included a "deluxe first-run motion picture theatre." As provided in the District Court's special interrogatory to the jury, the claim was that defendants entered into an illegal contract, combination or conspiracy to monopolize or unreasonably restrain trade or commerce "by preventing the entry of a competitive theatre in the proposed shopping center." The means allegedly used to prevent the entry of this theatre was to delay reconveyance of the undivided one-half interest in the 60 acres purchased by Solomon and Marvin at the outset of the venture. Hayes testified that the property was tied-up from November of 1970 until April of 1976.

These contentions require a review of Solomon's efforts to take-out Marvin, as he had agreed.

### 1. Marvin's role

Before Solomon entered the Memorandum of Understanding and agreed to acquire Marvin's interest and convey it to Hayes and Hayes, Inc., Marvin wrote Solomon a letter confirming a November 24, 1971 meeting during which Solomon agreed to honor Marvin's request to take him out of the Port Arthur shopping center transaction in January of 1972, in accordance with the Development Agreement. By December 30, 1971, Marvin apparently was having some second thoughts. In a memorandum for his own files describing a meeting with Solomon the day before, he wrote:

> The thought occurs, if there is any problems in connection with the transaction, Marvin could take the position that he is entitled to participate on a continuing basis and thereby acquire a 50% interest in the overall settlement from the theatres, and ride with that particularly in connection with any transaction made on those theatres with the Holiday Inn people.

As the extensive correspondence between Marvin and Solomon and their lawyers reflects, the two men were then engaged in a series of business ventures which Marvin wished to end. Marvin used his power to withhold conveyance of his interest in the 60 acres to Solomon as an effective instrument to obtain a resolution satisfactory to him of all other issues involved in severing their business relations, much like Solomon later used his interest in the shopping center development as leverage in dealing with Hayes. The negotiations were heated and intense. A long series of letters passed between counsel for Solomon and Marvin referring to meetings, requests for meetings, requests for information, and submissions of information, which were seasoned with mentions of confrontations at bargaining sessions. The evidence of these negotiations directly refutes plaintiffs' characterization of Marvin as a coconspirator who

was acting jointly with Solomon to delay Hayes's development. Marvin was concerned with advancing his own interests. In December of 1972, when the matters between Marvin and Solomon unrelated to the shopping center were ultimately resolved to Marvin's satisfaction, he conveyed to Solomon his interest in the 60 acres.

During the negotiations between Solomon and Marvin, the dealings between Solomon and Hayes became confused. Pending the ultimate resolution of the matters unrelated to the shopping center venture, Marvin did not sign the Agreement of Cancellation and by letter dated March 7, 1972, Hayes's attorney declared both the Agreement of Cancellation and the Option and Agreement to Purchase "of no further force and binding effect." From this reaction, Solomon's attorney concluded that plaintiffs no longer wished to be obliged to purchase the Solomon-Marvin undivided one-half interest in the 60 acres and had given up any right to purchase it, and so advised Solomon. Solomon's attorney acknowledged the March 7, 1972, letter stating that nothing could be effectuated until Solomon and Marvin settled "all their co-matters." Following his attorney's advice, Solomon would later assert that he was free to retain his property interest. Hayes and his attorney responded that the March 7, 1972, letter related only to the Agreement of Cancellation and the Option and Agreement to Purchase, which were specifically mentioned, and did not affect the Memorandum of Understanding and the Amendment to Memorandum of Understanding, which became effective on March 1, 1972, and imposed an absolute obligation on Solomon to transfer the property interest on demand. Plaintiffs considered the effect of this obligation was to absolutely bind Solomon to obtain Marvin's interest for reconveyance along with his own.

## 2. *Litigation*

Sometime in late 1972 or early 1973, Hayes and Solomon met at the Plimsoll Club in New Orleans. Solomon told Hayes what Solomon's attorney had said about the letter of March 7, 1972, and suggested that, if Hayes had some different view, he should get his attorney together with Solomon's attorney "to get it straight." No such meeting was ever arranged.

On March 11, 1973, Solomon met with Hayes and deNeve at Hayes's home to discuss matters unrelated to the property interest. During that meeting, the property interest came up, and, according to Hayes, tempers flared: "On the land, we went into—our voices—he and I got hot at each other, and he said that he did not have to sell me the land, his attorney had so advised him . . . ." The breakdown in relations was virtually complete. As of August 1, 1972, Solomon ceased making the $500 per month payments due Hayes under the Memorandum of Agreement because Hayes was "competing" with Golden Triangle Theatres, Inc. as one of the owners of a theatre then under construction in Orange, Texas, even though there was not an anti-competition clause in any of the agreements. Solomon attempted to pay the shopping center tract property taxes for 1971, and to have all further assessments on his undivided one-fourth interest in the tract billed directly to him. This was directly contrary to the Memorandum of Agreement which required Hayes to pay all taxes. Hayes interpreted this as a further manifestation by Solomon of his intention not to abide their agreement. Hayes contacted Solomon about Hayes's option to repurchase the Marvin-Solomon undivided one-half interest and Solomon responded that the courts would have to settle the matter.

In November of 1973, Hayes and Hayes, Inc. filed a declaratory judgment action in state court about the land issue. Solomon sent the summons to his lawyer who testified at this trial concerning some confusion surrounding a request for an extension in the state court proceedings. In January of 1974, plaintiffs took a default judgment which declared: the Memorandum of Understanding was in full force and effect; the Development Agreement was null and void and of no effect; the option of Hayes and Hayes, Inc. to repurchase the outstanding, undivided one-half interest in the 60-

acre tract was viable for three years from March 1, 1972. There was no motion to set the default judgment aside, and no appeal was taken.

Hayes and Hayes, Inc., however, were not yet ready to exercise the option. On October 1, 1974, Hayes wrote his attorney to ask when exercise was required. Almost four months later, more than a year after the judgment, Hayes notified Solomon that the option would be exercised on February 28, 1975, just before expiration. At the closing, Solomon's attorney had instructions to deliver Solomon's deed on receipt of a check for $100,000, a promissory note for $200,000, and a deed of trust executed by Hayes and Hayes, Inc. to secure the promissory note. However, no deed of trust was tendered, and the transaction did not close, though the Memorandum of Understanding did not address the question of security for the promissory note, a plaintiffs' witness opined that a deed of trust would be customary in such circumstances.

When the transaction did not close, Hayes and Hayes, Inc. filed a second law suit in state court, seeking specific performance of the option and damages of $500,000 for Solomon's alleged failure to perform under the Development Agreement, damages of $400,000 for Solomon's alleged failure to secure Marvin's signature on the Agreement of Cancellation and his failure to deliver the deed at the March 15, 1975, closing, and punitive damages of $1,000,000. Shortly thereafter, in August of 1975, plaintiffs went into federal court and filed the action appealed here, seeking treble damages for the same alleged wrongs. After defendants moved in this action for dismissal of the shopping center claim on the ground the state court pleadings showed it to be a simple breach of contract action, plaintiffs dismissed their damage claims in the state court action in early April of 1976.[4] When the damage claims were dismissed, a consent decree was entered in the second state court action under which Solomon was to convey his undivided one-half

interest on or before April 15, 1976. Solomon thereupon tendered the deed with a letter stating his position that Hayes and Hayes, Inc. were obligated to pay interest expressly due him under the Memorandum of Understanding. Plaintiffs refused to pay and accept the deed with the letter and moved again in the state court for execution. The state court ordered Solomon to convey the property without ruling on his claims for interest, and he did so on that same day. The interest was still unpaid at the time of this trial. The net result at that point was that Hayes and Hayes, Inc. had obtained, for $100,000 in cash and an unsecured $200,000 note, the undivided one-half interest which they had sold in 1970 for $300,000 cash. They had the interest-free use of the $300,000 for almost six years, and had established the right to a $200,000 unsecured loan for four years.

Although plaintiffs then had clear title to the 60 acres, they still did not commence construction of the hypothetical shopping center. Instead, the 60-acre tract was promptly mortgaged to obtain money for a venture not related to the theatre business. Basically, plaintiffs claim here that the defendants managed to delay the shopping center for almost five years. During this time, the cost to construct the shopping center with its theatre greatly increased. At trial, plaintiffs successfully argued that having "burned down the barn to kill the horse," defendants were liable to pay for the increased costs which would have been incurred were the barn built later. The jury awarded damages of $3,000,000 before statutory trebling, against all four defendants based on the increased costs since 1972 of constructing a $14,000,000 shopping center.

### H. Role of the Corporate Defendants

The three corporate defendants have been mentioned only briefly in the foregoing recital, despite its length, because none of them played any role in the proposed shopping center development or in the dis-

---

4. Hayes himself acknowledged the lure of the golden fleece of treble damages: "I dismissed it because I was advised that the damages were more—would be better in Federal Court."

pute over the 60-acre tract. They became embroiled in this litigation as a result of their acquisition of Solomon's theatre interests, on August 31, 1972, after Solomon's negotiations with Holiday Inn proved unfruitful.

For the purpose of acquiring Solomon's theatre interests, Fuqua Industries, Inc. created two wholly owned subsidiaries: Gulf States Theatres, Inc. and Gulf States Theatres of Texas, Inc. On August 31, 1972, Golden Triangle Theatres, Inc., which was by then wholly owned by Solomon, was merged into Gulf States Theatres of Texas, Inc.; Solomon received Fuqua Industries, Inc. stock in exchange for his stock in Golden Triangle Theatres, Inc. Also on August 31, 1972, Solomon's stock in various other corporations owning and operating theatres elsewhere was acquired by Gulf States Theatres, Inc. in exchange for cash and notes. As part of these transactions, Solomon sold all his theatre interests in Texas and became president and chairman of the board of both subsidiaries. Fuqua Industries, Inc. does not provide management for any of its subsidiaries, and for this reason could not otherwise have purchased Solomon's companies. Solomon's employment agreements with Gulf States Theatres, Inc. and Gulf States Theatres of Texas, Inc. charged him with general supervision of their business, but permitted him to devote time to "his personal business activities, investments, development of real estate and other interests."

None of the corporate defendants engages in shopping center development. When Gulf States Theatres of Texas, Inc. and Gulf States Theatres, Inc. acquired Solomon's theatre interests, they acquired no interest in his land dealings with Hayes. C. L. Patrick, who as president of Fuqua Industries, Inc. negotiated the deals, had no knowledge at that time of the 1970 Development Agreement or its termination. Indeed, he did not become aware of the land dealings until early in 1976, when Hayes told him about them.

## I. *The Mid-County Claim*

By January of 1972, deNeve, like Hayes, was no longer working for Solomon. Hayes and deNeve then joined together to engage in other theatre operations with Hayes's father, their lawyer and Leroy Mitchell, a Texas film exhibitor. In June of 1972, Hayes, deNeve and their three partners formed Mid-County Enterprises, Inc. for the avowed purpose of building a triple-screen first-run drive-in theatre in Port Arthur, just south of the airport.

Mid-County Enterprises, Inc. never built the drive-in, and it successfully contended at trial that threats of defendants kept it from doing so. Hayes and deNeve testified that Solomon made these threats to them in March of 1973. Solomon dispatched an agent to locate a site hear the proposed site for the Mid-County Theatres, Inc. theatre. He also threatened Hayes that, if the proposed Port Arthur theatre was built, Solomon would build against Hayes at another location and would delay the shopping center venture. At a meeting on June 1, 1974, Solomon handed Hayes a handwritten demand, which read in block letters: DO NOT BUILD AGAINST GULF STATES. The jury was authorized to have found that Solomon made the threats. However, from the evidence it appears that it was not the threats that prevented Mid-County Enterprises, Inc. from proceeding with construction.

Plaintiffs pleadings alleged that the threats were made *after* extensive site work had begun, equipment had been ordered, and monies had been expended on the drive-in. As we shall detail below, the corporation's own financial records indicate that *after* the meeting at which the threats were made, it spent $94,987.10 in connection with building the drive-in and borrowed considerably more.

deNeve, who was president of Mid-County Enterprises, Inc., admitted on cross-examination that the alleged threats by Solomon really did not stop the corporation from proceeding with the drive-in project. After deNeve was confronted with the figures showing that most of the corporation's

spending in connection with the theatre occurred after the March 1973 meeting with Solomon, he then testified:

Q. If you spent that kind of money after March 11, 1973, when there has been testimony about a meeting at Mr. Hayes's house, whatever was said at that meeting—

A. Yes, sir.

Q. —didn't keep you folks from going on with your efforts to building the drive-in, did it?

A. No, sir, it wouldn't.

Leroy Mitchell, a shareholder who testified by deposition, admitted that the drive-in construction was abandoned because of a lack of funds.[5]

Nonetheless, Mid-County Enterprises, Inc. successfully contended at trial that it possessed the requisite intent and preparedness to construct the theatre but was prevented from doing so by the defendants' illegal threats and conduct. The jury awarded Mid-County Enterprises, Inc. $258,300 damages, before statutory trebling, against the four defendants on the claim that the construction and operation of the drive-in were blocked as a result of Solomon's threats.

### J. *The Park Plaza Claim*

The facts involved in the claim of plaintiff Park Plaza Twin Theatres, Inc. are relatively simple. As already stated, Hayes and Solomon decided in December of 1971 to separate their business interests but agreed that Solomon would continue to operate the Park Plaza Theatre. For this purpose, the theatre was leased to Golden Triangle Theatres, Inc. on January 19, 1972.

The Park Plaza Theatre was a modern twin-screen theatre, and at that time Golden Triangle Theatres, Inc. owned two other older single-screen theatres in Port Arthur. When Golden Triangle Theatres, Inc. was merged into Gulf States Theatres of Texas, Inc. in August of 1972, the lease and operation of the Park Plaza Theatre were taken over. Thereafter, Gulf States Theatres of Texas, Inc., following the prevailing trend among motion picture exhibitors, renovated its other two older theatres by converting each to a triple-screen theatre.[6]

In August of 1973, unhappy with the improvements of the other two theatres and with the type of films being shown at the Park Plaza Theatre, Hayes and Park Plaza Twin Theatres, Inc. sued Gulf States Theatres of Texas, Inc. and Solomon in state court, charging a breach of contract in that the defendants had wrongfully increased the number of screens in their own theatres and had not played all the best films at the Park Plaza Theatre, as required by the lease. Plaintiffs contended that the defendants set about to enhance their wholly owned theatres at the expense of the leased theatre. A state court judgment against Gulf States Theatres, Inc., voiding the lease was entered on June 30, 1975. The state court found that exhibition of X-rated films at the Park Plaza Twin Theatres had "cheapened its reputation and damaged its good will and standing in the community and reduced its value" in addition to several continuous and intentional violations of various lease provisions. Park Plaza Twin Theatres, Inc. was awarded $2,150 "which represent[ed] damages for exhibiting the best motion pictures available for licensing in . . . Port Arthur . . . [at its own theatres] instead of the Park Plaza Twin Theatre." The judgment imposed no liability on Solomon. Apparently, no claim for separate damages for injury to good

---

5. When confronted with the deposition statement by Leroy Mitchell admitting that the drive-in was not built because of a lack of funds, deNeve hedged somewhat and said the lack of funds was "not altogether" the reason.

   Over defendants' hearsay objection, deNeve was permitted to testify at trial that Mitchell had informed him of a line of $1,000,000 for their corporation to furnish the theatre.

6. Solomon explained that his policy was to keep a town properly staffed with a number of deluxe theatres "in order to keep competition from other theatres out of the city . . . . Our company has taken the position that rather than have outsiders come in, even though they have a right, we could profit and handle film better having enough screens ourselves to discourage outsiders from coming in."

will was raised. *See Gulf States Theatres of Texas v. Hayes*, 534 S.W.2d 406, 407–08 (Tex.Civ.App.1976) (writ refused n.r.e.). Park Plaza Twin Theatres, Inc. seemingly now seeks to remedy its omission in the state court by claiming such damages under the guise of antitrust relief. The jury assessed damages of $225,000, before statutory trebling.

As necessary, we will develop the facts more fully when discussing particular issues.

## III. DISCUSSION·

Defendants present fifteen separate issues dealing primarily with factual matters. As a preface to our discussion of the contentions we found controlling, we emphasize the narrow confines of our reviewing authority when dealing, as we are here, with an appeal from a jury verdict.

A jury trial is an integral part of the federal antitrust statutory scheme. This Court said as much in *Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc.*, 383 F.2d 97, 103 (5th Cir. 1967), *cert. denied*, 390 U.S. 904, 88 S.Ct. 816, 19 L.Ed.2d 870 (1968), quoting *Beacon Theatres v. Westover*, 359 U.S. 500, 504, 79 S.Ct. 948, 953, 3 L.Ed.2d 988 (1959):

> The right to trial by·jury applies to treble damage suits under the antitrust laws, and is, in fact, an essential part of the congressional plan for making competition rather than monopoly the rule of trade . . . .

*See also Fleitmann v. Welsbach Street Lighting Co.*, 240 U.S. 27, 29, 36 S.Ct. 233, 60 L.Ed. 505 (1915). This Court established the standard of review which is applicable to the present case in *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (*en banc*) (note omitted):

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the nonmover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*See Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564 (5th Cir. 1978); *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256 (5th Cir. 1978). Applying this standard to the evidence here, we reverse the judgment entered on the jury's verdict.

### A. *Shopping Center Claim*

Plaintiffs Hayes and Hayes, Inc.'s shopping center claim is something of a Procrustean effort to apply the rubric of antitrust laws to an acrimonious falling-out between two close business associates. As such, plaintiffs' recovery on the shopping center claim is beyond the stretch of the antitrust laws. "The antitrust laws were never meant as a panacea for all wrongs." *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794, 804 (7th Cir.) *cert. denied*, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961), *cited in*, *Harrison v. Prather*, 435 F.2d 1168, 1176 (5th Cir. 1970), *cert. denied*, 404 U.S. 829, 92 S.Ct. 67, 30 L.Ed.2d 58 (1971). This case "concerns nothing more than a state law construction contract dispute over

which the federal court had no jurisdiction." *Morgan v. Odem*, 552 F.2d 147, 148 (5th Cir. 1977); *Harrison v. Prather*, 435 F.2d at 1176–77. We do not mean to suggest that a state contract law dispute cannot also give rise to a federal antitrust claim. *See Mulvey v. Samuel Goldwyn Productions*, 433 F.2d 1073, 1075 (9th Cir. 1970), *cert. denied*, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971). We simply conclude that the underlying claim which plaintiffs established is not the type of injury that the federal antitrust laws were intended to forestall. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487–88, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Conference of Studio Unions v. Loew's Inc.*, 193 F.2d 51, 54 (9th Cir. 1951), *cert. denied*, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). The basic reason for which the shopping center claim fails as an antitrust claim is that the injuries for which damages were awarded were not antitrust injuries. In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. at 489, 97 S.Ct. at 697 (citation and note omitted), the Supreme Court emphasized:

> Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

*Cf. Donovan Construction Company v. Florida Telephone Corp.*, 564 F.2d 1191 (5th Cir. 1977), *cert. denied*, 435 U.S. 1007, 98 S.Ct. 1878, 56 L.Ed.2d 389 (1978).

██ Of course, one need not have an actual going business to establish a private antitrust injury under 15 U.S.C.A. § 15. Recovery can be had for a wrongfully frustrated attempt to enter a business. This was plaintiffs' theory of the case: defendants wrongfully prevented plaintiffs' entry into the motion picture exhibition business by sabotaging the shopping center which would have had a theatre tenant. There are "two significant requirements" for establishing such an entitlement to recovery: (1) an intention to enter the business, and (2) a showing of preparedness to enter the business. *Martin v. Phillips Petroleum Company*, 365 F.2d 629 (5th Cir.), *cert. denied*, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); *North Texas Producers Association v. Young*, 308 F.2d 235 (5th Cir. 1962), *cert. denied*, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963). We believe that the plaintiffs failed to establish sufficient preparedness to enter the business of motion picture exhibition.

In *Martin v. Phillips Petroleum Company*, 365 F.2d at 633–34, this Court listed four elements of preparedness: (1) "the ability of plaintiff to finance the business and to purchase the necessary facilities and equipment"; (2) "the consummation of contracts by the plaintiff"; (3) "affirmative action by plaintiff to enter the business"; (4) "the background and experience of plaintiff in the prospective business." *See also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964 (5th Cir. 1977); *Buckley Towers Condominium v. Buchwald*, 533 F.2d 934 (5th Cir. 1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 571 (1977); *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); *Woods Exploration & Packing Co., Inc. v. Aluminum Company of America*, 438 F.2d 1286 (5th Cir. 1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). *See generally* Note, *Private Treble Damages Antitrust Suits: Measure of Damages of All or Part of a Business* 80 Harv.L. Rev. 1566 (1967).

Plaintiffs' damage theory is based on the premise that they were prevented from starting construction of a shopping center in September of 1972. This beginning point is critical. Plaintiffs seemingly have tried to bolster their case by implying that the failure of the joint venture in July of 1971 was itself an antitrust violation and not

mere background. We focus only on the question of plaintiffs' own preparedness to construct a shopping center however, because they sought damages not for the failure of the joint venture but only for their own failure to proceed in September of 1972.[7] At plaintiffs' request, the District Court charged the jury that it was to calculate any damages for the shopping center claim as follows:

> Now in regard to the damage issue on the shopping center, the Court would instruct you in determining the damages, if any, to the business and property of the plaintiffs, Hayes and Hayes, Incorporated, you should take into consideration the increased cost of constructing a regional shopping center beginning at the present time over the cost of constructing the same center if constructed—if construction had begun in September, 1972.

The parties are agreed that development of a regional shopping center is a very difficult undertaking. It involves, among a myraid of lesser undertakings, procuring tenants, arranging financing, and hiring an architect and a construction engineer. The lead time for such a project is measured in years, not in weeks or months.[8] After the shopping center joint venture fell apart in 1971, plaintiffs made no significant effort to develop a shopping center on their own. In February of 1972, Hayes solicited a proposal from Architectonics, Inc. and received virtually the same initial proposal the firm had provided the joint venture. The initial proposal went unanswered for several years. Plaintiffs did not order plans drawn up until, months after instituting this action, they retained the architectural firm to draw the plans for use at trial which might have been drawn for use in construction. From these drawings, an experienced shopping center contractor provided plaintiffs with construction costs figures for use in their case.

Neither in 1972 nor at any other time did plaintiffs have commitments from prospective tenants, although tenant commitments were essential if any shopping center was ever to be built. Plaintiffs offered no evidence, except for Marvin's unsuccessful nascient efforts during the joint venture, that they or anyone on their behalf ever contacted potential shopping center tenants before trial. Plaintiffs did nothing to borrow shopping center construction funds and certainly expended none.

The testimony of plaintiffs' own witnesses shows how far the proposed shopping center was from realization. The representative of Architectonics, Inc. testified that the joint venture was in a "very preliminary state" in 1971 and that his firm could not have guaranteed anything would actually be built. A retired vice-president of Homart Development Company, a shopping center development subsidiary of Sears, Roebuck & Company, testified that, although "people do a lot of talking," "only one out of twenty" contemplated shopping centers are ever built. He also testified that, to start construction in 1972, it would have been necessary to sign up tenants in 1970 and 1971. The representative from Architectonics, Inc. provided one reason for the high mortality rate of shopping center projects when he testified, "you can't build these without the department stores, they are very strong in their opinions." The Homart Development Company vice-president also stated that in 1972 "department stores started to pull in their horns" because of the poor economy. When asked whether new environmental requirements also had an adverse impact on shopping center development, plaintiffs' own con-

7. Apart from Hayes's own testimonial concession that plaintiffs sought no damages for failure of the joint venture, the fact is that any antitrust claim for failure of the joint venture would likely be barred by the four year statute of limitations and was subject to the release, together with all other claims growing out of the failed venture, by the provisions of the Memorandum of Understanding.

> Our written attention is intentionally narrowed to plaintiffs' preparedness. Since the shopping center claim must fail on that question, we need not discuss in detail the other thrusts and parries of the parties surrounding that claim.

8. See note 3, supra.

struction expert testified that "everything slowed up here a couple of years ago." The elder Hayes also conceded that Hayes, Inc. had never submitted a shopping center site plan to the Port Arthur City Council despite a city ordinance and zoning change adopted in 1973.

Hayes and Hayes, Inc. failed also to offer substantial evidence that they were capable of securing the money that would have been needed to build a shopping center, a sum their own experts said would exceed $14,000,000. Without commitments from 70% of the needed tenants—including at least two anchor tenants—loans would not have been available for a shopping center, even to a credit-worthy borrower. Hayes and Hayes, Inc. made no showing of their credit-worthiness, though Hayes testified that, he increased his obligations from $3,000,000 in 1969 to approximately $7,000,000 in 1973. Plaintiffs simply failed to prove their capacity to raise the amount of money a shopping center would have cost or the additional, presumably greater, sum required to develop the adjacent land and make the proposed shopping center viable.

Plaintiffs depend on the testimony of the Homart Development Corporation retired vice-president: "As to financing, [he] testified that there were two prime sources *available,* [two insurance companies] Connecticut General or Teachers, who *would have loaned* up to 100% of the construction cost eliminating any equity capital requirements other than the valuable land." Brief of Appellees at 36 (emphasis added). Putting aside the facts that there is no evidence that either Hayes or anyone else acting on behalf of the plaintiffs ever even spoke to either insurance company or any other possible lender and that Hayes and Hayes, Inc. already had substantial obligations, the vice-president's testimony does not support plaintiffs' assertions:

Q. [I]n arranging the financing for the center, where would Mr. Hayes *look* to obtain him financing?

A. *Probably* Connecticut General or Teachers—two of the largest shopping center lenders.

Though he did opine that one might be able to obtain 100% financing, he expressly restricted that possibility to the situation in which a borrower had obtained leases from all the anchor tenants and 70% of the smaller tenants. As we have already noted, except for Marvin's preliminary overtures during the joint venture, Hayes and Hayes, Inc. themselves never sought out any tenants and of course had not signed leases. The mere possibility of financing being available in the abstract is not enough. Showing that someone somehow could possibly obtain financing is not the same as showing that plaintiffs themselves were able and prepared to do so.

The evidence on which plaintiffs rely could not conceivably show preparedness in 1972. Their references to what was done by Architectonics, Inc. and by their construction engineers are to what the firms did in 1976 to help prepare for the presentation of this case.

As part of their discussion of the appropriateness of the damage award,[9] plaintiffs elaborate on their preparedness claim, but it is no better the second time around. Their listing of what they claim to have done to pursue their interest in developing the 60-acre tract relates mostly to their trial preparation and activities long after September of 1972, when construction would have had to have begun to conform to the plaintiffs' damage theory. Too little was too early; too much was too late.

Plaintiffs represent that: (1) they hired Architectonics, Inc. to prepare a master lease and site plan—but the record discloses the actual hiring of the firm in December of 1975, four months after the present action was filed, to work with plaintiffs' counsel and prepare plans and drawings for use at trial; (2) they retained the retired vice-president of Homart Development Company to direct leasing and planning—but the

---

9. Given our result, we need not reach the other issues raised surrounding the damage award. *See* note 7, *supra. Cf. Terrell v. Household*

*Goods Carriers Bureau,* 494 F.2d 16 (5th Cir.), *cert. dismissed,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974).

record discloses that Hayes worked with him during 1976 in preparing for trial; (3) they had contracts and had obtained strong expressions of interest from a major tenant—but the record shows that the possible tenant sent Hayes a telegram during the first week of trial which was noncommittal and which offered no suggestion of becoming a major tenant; (4) they had their construction engineering firm bid out the construction—but the witness from that firm testified that the plans could not be put out for bids until they were much more detailed and that plaintiffs had never contracted with his company for any construction; (5) they obtained a financing commitment on the theatre portion—but the record discloses an oral request by Hayes in November of 1974 for a $350,000 loan for preliminary financing to build a free-standing theatre, not a shopping center, and the "commitment" was not evidenced by a bank writing and the bank officer testified that the loan would have had to have been fully secured "if we would loan him the money," and that, in any event, "[we] didn't get that far"; (6) they had a preliminary engineering study done—but the record discloses only a May 1969 engineering report which concluded that $12,780,400 in recommended improvements like drainage and sewer facilities, streets and water systems were needed if Hayes, Inc.'s 1,400-acre tract were ever to be developed; (7) they obtained an approved environmental impact state-ment—but the record discloses only a December 1975 document dealing not with a shopping center but with government financing for housing under Title X of the National Housing Act; (8) they had the tract zoned as a regional shopping center under the Port Arthur Master Plan—but what the Port Arthur City Council did in July of 1973 had little significance, because the 60-acre tract of land had long been commercially zoned and plaintiffs never submitted the site plan required by the ordinance. In a further attempt to show their own preparedness, plaintiffs point to Marvin's efforts, his correspondence and his records exhibiting a professional enthusiasm for the joint venture. But his enthusiasm evinced no preparedness; there is nothing in the record even approaching a commitment by a prospective tenant to the joint venture. In any event, the bright prospects of the joint venture before they so dramatically dimmed shed no light on the plaintiffs' own preparedness. Finally, in their effort to preserve their verdict, plaintiffs point to the jury instructions on preparedness, which defendants requested and which defendants do not challenge.[10] A correct jury instruction, however, cannot entitle plaintiffs to a verdict which is not supported by substantial evidence of their preparedness to construct a shopping center in September of 1972.

Plaintiffs cannot recover antitrust damages for the frustration of so ethereal a

---

10. The District Court instructed on preparedness:

Now, actual money damage cannot exist unless there is some business or property to be damaged.

In the anti-trust laws, the actual money damage must be directed at a plaintiff's business or property. Therefore if you find that any plaintiff did not have the kind of business or property which is protected by the Sherman Act—Sherman Anti-Trust Act—you must find for each defendant against the plaintiff—you must find for each defendant against the plaintiffs.

In order for a plaintiff to have business or property within the meaning of the anti-trust law, he must have more than merely an intent or idea to enter the relevant market, although it is not necessary for it to have an actual going business. The plaintiff has the burden of showing by a preponderance of the credible evidence both the intent and the preparedness to enter the business and the plaintiff must also show due diligence on its part to prepare and operate any business it maintains it would have entered.

In considering whether each plaintiff has met the assigned burden of showing preparedness for its own business or property, you may consider, for example, the ability or inability of the plaintiffs to finance the business and to purchase and operate the necessary facilities and equipment.

In other words, the feasibility and its probability of success from the standpoint of earning a profit, affirmative actions, if any, the plaintiff has taken toward entering the business or its failure to affirmatively move forward, the background and experience of each plaintiff in the prospective business.

project.[11] As we have already noted, before an antitrust claimant can recover for a frustrated attempt to enter a business, there must be a showing of preparedness to enter. Plaintiffs failed to introduce substantial evidence of their preparedness to construct the regional shopping center in September of 1972. It almost goes without saying that, if plaintiffs did not prove preparedness to construct the proposed shopping center, they did not prove preparedness to construct a theatre in that shopping center. *See generally Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 126–28, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Martin v. Phillips Petroleum Co.,* 365 F.2d 629 (5th Cir.), *cert. denied,* 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); *Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383, 395–96 (6th Cir. 1962), *cert. denied,* 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); *Duff v. Kansas City Star Co.,* 299 F.2d 320 (8th Cir. 1962); *Peller v. International Boxing Club, Inc.,* 227 F.2d 593 (7th Cir. 1955); *Triangle Conduit & Cable Co. v. National Electric Products Corp.,* 152 F.2d 398, 399 (3d Cir. 1945). We reverse the judgment and remand to the District Court with instructions to dismiss the shopping center claim. The antitrust laws were not designed to protect such shopping centers in the air which are so easily built.[12]

### B. *Mid-County Enterprises, Inc. Claim*

Plaintiff Mid-County Enterprises, Inc., claimed that Solomon kept it from building a drive-in theatre in Port Arthur by his threats to compete vigorously with the proposed drive-in and to try to drive it out of business, if it were ever built. On the basis of evidence which we shall detail, the jury concluded that the alleged conduct amounted to an antitrust violation by all the defendants and awarded Mid-County Enterprises, Inc. damages of $258,300 before statutory trebling. We once again voice our general reluctance to undo a jury verdict, but we cannot find substantial evidence in this record that the alleged conduct was a material and proximate cause of the abandonment of the drive-in.

Of course, we must assume that threats were in fact made by Solomon in an effort to discourage the drive-in proposal, despite his own denials of any threats.[13] A statement of intent to compete, however, even if perceived as a threat, is not unlawful. Such a manifestation of intent to triumph in the competitive market, in the absence of unfair, anti-competitive or predatory conduct, is not enough to establish an antitrust violation.[14] *Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 19 (9th Cir. 1971). *See also Panotex Pipe Line Co. v. Phillips Petroleum Co.,* 457 F.2d 1279, 1288–89 (5th Cir.), *cert. denied,* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 86 (1972); *Pacific Engineering & Production Company of Nevada v. Kerr-McGee Corp.,* 551 F.2d 790, 795 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *Purex Corp. v. Procter*

---

11. Given our result, we need not reach defendants' other varied challenges to plaintiffs' conspiracy theory and proof. *See* note 7, *supra.*

12. "Castles in the air—they are so easy to take refuge in. And so easy to build, too." Henrick Ibsen: *The Master Builder III.*

13. Though he denied making "threats," Solomon did admit that he went to great lengths to discourage the proposal:

Q. Did you ever tell Mr. deNeve not to build in Mid-County area?
A. I don't know that I told Mr. deNeve. I will say this: that I did all I could to discourage him to build the theatre, I didn't think it was a practical and necessary—I would rather him not have built the theatre.
Q. You did all you could to discourage him?
A. Well, within reason, I didn't put a gun on him or anything and say they couldn't build it, I tried to talk Mr. deNeve and Mr. Hayes out of it, not building the theatre.

Later during a confrontation meeting concerning the recission of the joint venture on June 1, 1974, Solomon handed Hayes a handwritten note, listing his general terms, which stated in bold letters "DO NOT BUILD AGAINST GULF STATES."

14. Defendants rather convincingly argue that the District Court committed reversible error in its failure to give their requested charge, that statements of intent to triumph in a competitive market do not necessarily violate the antitrust laws. We think the Mid-County Enterprise, Inc. claim more vulnerable on another attack, however, and need not reach the issue.

& Gamble Co., 419 F.Supp. 931, 942 (S.D. Cal.1976). Before Mid-County Enterprises, Inc. could recover any antitrust damages for *not* building a drive-in theatre, it had to show by probative and substantial evidence that it had the intention, preparedness and capability to go forward with the project and that the abandonment of the project was proximately and materially caused by acts of the defendants. Causation must be proved "as a matter of fact and with a fair degree of certainty." *Terrell v. Household Goods Carriers Bureau,* 494 F.2d 16, 20 (5th Cir.), cert. denied 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). See also *Yoder Bros. Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1371 n.25 (5th Cir. 1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). *Comfort Trane Air Conditioning Company v. Trane Company,* 592 F.2d 1373 (5th Cir. 1979); *Response of Carolina, Inc. v. Leasco Response, Inc.,* 537 F.2d 1307, 1323 (5th Cir. 1976); *Cinema-Tex Enterprises, Inc. v. Santikos Theaters, Inc.,* 535 F.2d 932 (5th Cir. 1976); *International Rys. of Central America v. United Brands Co.,* 532 F.2d 231 (2d Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 101, 50 L.Ed.2d 100 (1976); *M. C. Mfg. Co. v. Texas Foundaries, Inc.,* 517 F.2d 1059, 1064 (5th Cir. 1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976); *Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 695 (5th Cir. 1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976); *Shumate & Co. v. NASD, Inc.,* 509 F.2d 147, 153 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975); *Johnson v. American Federation of Musicians,* 101 U.S.App.D.C. 193, 247 F.2d 599 (1957).

■ We have no quarrel with the general rule that "[t]he willful acquisition or maintenance of the monopoly power can be demonstrated by 'conduct designed to barricade access to markets or inhibit production . . .'" *Heatransfer Corp. v. Volkswagen Werks, A. G.,* 553 F.2d 964, 981 (5th Cir. 1977), *citing Woods Exploration & Production Company, Inc. v. Aluminum Company of America,* 438 F.2d 1286, 1307 (5th Cir. 1971), *cert. denied,* 404 U.S. 1047, 92

S.Ct. 701, 30 L.Ed.2d 736 (1972). Likewise, our concern is not with the proof of the *amount* of antitrust damages but with *fact* of antitrust damage. In *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20 (5th Cir.), *cert. dismissed,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974) (note omitted), this Court explained the difference between the two and set out the standard we must apply:

The distinction between the fact of damage and the amount of damage is especially important in a case such as the one *sub judice* in which the injury to plaintiff may have been attributable to several factors, not all of which can be the basis for liability on the part of the defendant. In such a case the plaintiff need not prove that the defendant's wrongful actions were the sole proximate cause of the injuries suffered. He must show only, as a matter of fact and with a fair degree of certainty, that defendant's illegal conduct materially contributed to the injury. Once the important causal link between the actions of the defendant and the injury to the plaintiff has been established, the plaintiff may enter the more uncertain realm of evaluating the portion of the injury that may be attributed to the defendant's wrongful conduct.

■ We hold that plaintiff Mid-County Enterprises, Inc., did not prove by substantial evidence that the defendants' alleged antitrust misconduct materially contributed to abandonment of the proposed drive-in theatre. The evidence permits but two conclusions about the proposed drive-in theatre: first, the threats from Solomon did not in fact materially contribute to the decision not to go forward with the proposal, and second, by July of 1974, when Mid-County Enterprises, Inc. claimed to have been forced to abandon the project by Solomon, it had devoted most of the funds borrowed for construction to other unrelated pursuits. Under these circumstances, defendants' acts were not a material proximate cause of the

proposal's failure, and judgment must be for defendants.[15]

The chronological relationship between Solomon's threats, which were assertedly made in March of 1973, and the evidence of Mid-County Enterprises, Inc. concerning its preparedness to build a drive-in theatre belies the contention that the threats discouraged the construction.

On July 6, 1973, four months *after* the Solomon threats, Mid-County Enterprises, Inc. gave a Port Arthur bank a note for $300,000 for funds to construct the proposed drive-in theatre. On this same day the corporation acquired the land on which, it is claimed, the proposed drive-in theatre was to be located; it leased a 20-acre tract owned by Hayes and his father, for a rental of $300,000 payable in fifteen annual installments of $20,000. In January of 1974, Mid-County Enterprises, Inc. wrote letters to distributors asking for the opportunity to bid for films for the proposed theatre and announcing an opening date, May 30, 1974. Then, between February and July of 1974, according to the corporation's own evidence, a contractor was employed on the premises who was ultimately paid some $28,897 for work performed under deNeve's supervision, for which Mid-County Enterprises, Inc. paid an additional $7,650. Plaintiffs also represented that Mid-County Enterprises, Inc. bought some $61,250 worth of dirt fill from Hayes and his father. Accepting the figures of Mid-County Enterprises, Inc., by July 19, 1974, when the decision to abandon the drive-in theatre project was made, it had spent $111,790.84 on the project—$16,803.74 *before* and $94,987.10 *after* the March threats. These figures corroborate the admission of deNeve, president of Mid-County Enterprises, Inc., that whatever Solomon said would not keep the project from going forward.

Although it is *not* necessary, in order to overturn this verdict, for us to determine why the drive-in theatre proposal was abandoned, plaintiffs evidence makes it appear clear that the funds borrowed for the project were dissipated for other purposes. One such purpose was to provide loans to its stockholders and its affiliates. By year's end 1975, Mid-County Enterprises, Inc. had loaned $9,000 to Hayes, $5,000 to Hayes's father, $50,645.83 to shareholder Mitchell, $22,523.98 to one affiliated corporation owned by its stockholders, and $5,000 to another similarly owned affiliate. During 1974, Mid-County Enterprises, Inc.'s loans to these two affiliates increased and by year end totaled some $130,252.15 including unpaid interest. The president of the Port Arthur bank which made the $300,000 construction loan testified that he was not fully aware of these loans by the corporation and added that he would have been alarmed had he known the use to which Mid-County Enterprises, Inc. was putting the loan proceeds it had borrowed as construction funds.

Obviously, these diversions could not continue indefinitely, and there came a time when the money simply ran out. Leroy Mitchell, who was a former shareholder and loan recipient of Mid-County Enterprises, Inc. and no longer an interested party, testified on his deposition which was introduced at trial by defendants:

Q. Do you know why you abandoned construction in that drive-in theatre in Mid-County Enterprises?

A. It was because of lack of funds.

After Mid-County Enterprises, Inc. ran out of funds, its shareholders apparently decided to create a record that Solomon, rather than they, bore responsibility for abandonment of the project. Minutes of a

---

15. There is no evidence in the record that Fuqua Industries, Inc. or Gulf States Theatres, Inc. had any connection with making the threats. If, as we assume, Solomon did make the threats, then he did so as an officer of Gulf States Theatres of Texas, Inc. Viewed isolated from the shopping center claim and the Park Plaza Twin Theatres, Inc. claim, we have been directed to no evidence from which any unlaw-

ful conspiracy could have been inferred by a properly instructed jury. However, we do not base our holding on the lack of evidence of conspiracy. Our focus is on the causal nexus between the threats and the abandonment of the project, instead. *See Shumate & Co. v. NASD, Inc.,* 509 F.2d 147, 153 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975).

Mid-County Enterprises, Inc. Board of Directors, ostensibly reporting a meeting held on July 19, 1974, read as follows:

> The Chairman [deNeve] stated that the corporation had entered into a Lease with Roy Hayes and Lloyd Hayes in July of 1973 with the intent of constructing a triple screen drive-in theatre on the leased premises which are situated in Jefferson County, Texas. The Chairman then stated that he regretted [sic] to advise the Shareholders and Directors that the project would have to be abandoned because some of the officers of the corporation had received threats from competing theatres in the area, acting through T. G. Solomon [sic], to the effect that if the corporation built the proposed drive-in theatre at the above described location, they would put Midcounty Enterprises, Inc. out of business, as they did in Jackson, Mississippi. The Chairman then stated that even though the corporation had invested $104,289.83 in the project and had paid $20,000.00 in prepaid rents to the Landlords of the leased premises, the corporation did not have the financial resources to withstand the threatened actions of Mr. Soloman [sic] and the competing theatres. Accordingly, the Chairman recommended that the above described drive-in theatre project be abandoned.

Defendants convincingly assert that these minutes were not prepared on or about July 19, 1974, and that the statements reported could not have been made on or about that date. The amount of the investment stated, $104,289.83, was not ascertainable at that time because $2,200 of that amount was not reflected in Mid-County Enterprises, Inc. records until August and October of 1975. Plaintiffs' accountant was asked about the discrepancy between the records and the minutes:

> Q. * * *
>
> Now my question is: how did the chairman know—of Mid-County—know on July 19, 1974, that he was going to incur a debt of $2,200 in October 1975?
>
> A. You might ask the Chairman that question, not me, because they are the figures I have here.

These minutes, although dated before litigation, were apparently prepared just before the lawsuit was filed in August of 1975 and entered *nunc pro tunc*. The corporation's lawyer, when submitting statements for services, described with specificity any minutes he prepared. The minutes of the meeting on July 19, 1974, are not referred to in any contemporaneous billing. Mid-County Enterprises, Inc. has never disputed defendants' charge that these minutes were part of the preparation of plaintiffs' lawsuit for use at trial. For these reasons, we cannot give the minutes substantial credence.

Mid-County Enterprises, Inc. in response, attempts to point out other evidence that funds were available in the event they were needed. It points to deNeve's claim that Mitchell could obtain $1,000,000 for the corporation from the same Port Arthur bank which had provided the $300,000 construction loan. deNeve was permitted to testify, over objection, that Mitchell had once mentioned that he had an open line of credit of $1,000,000 from that bank which he would make available to Mid-County Enterprises, Inc. Plaintiffs did not call Mitchell at trial and his purported statement that he had a line of credit which would be available to the corporation is inconsistent with his deposition testimony, quoted above, that a lack of funds stopped the project. The president of the bank, who testified before deNeve, did not refer to any $1,000,000 line of credit at the disposal of Mid-County Enterprises, Inc., and, indeed, recalled meeting Mitchell only once. deNeve himself conceded that, by July of 1974, Mitchell was anxious to end his participation because he did not want to incur any additional liability to finance the corporation.[16]

---

16. We need not determine whether deNeve's testimony about Mitchell's credit was hearsay or, if it was hearsay, whether admitting it was reversible error. *See Gibson v. United States*, 363 F.2d 146, 148 (5th Cir. 1966). The specific reason why the drive-in project did not go forward is not significant once it is determined that the alleged anticompetitive threats did not

After reading the record, we hold that plaintiffs did not prove by substantial evidence that any act on the part of the defendants materially contributed to the decision to abandon the drive-in theatre project. Therefore, we reverse and remand with instructions to the District Court to dismiss the Mid-County Enterprises, Inc. claim.

C. *Park Plaza Twin Theatres, Inc. Claim*

The salvo defendants aim at the claim of Park Plaza Twin Theatres, Inc. is a mixture of purely legal points, complaints about the jury charge, challenges to several of District Court's evidentiary rulings and claimed insufficiencies in the evidence. We reverse and remand Park Plaza Twin Theatre Inc.'s claim for a new trial.

Defendants initially contend that Park Plaza Twin Theatres, Inc. was not entitled to seek antitrust damages because it was but a landlord and was not engaged in the film exhibition business during the alleged damage period. They argue that it was thus outside the pertinent competitive sector of the economy.[17] As support for their theory, defendants rely on *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). This reliance, we believe, is misplaced. In that case, the United States Court of Appeals for the Second Circuit did hold that the nonoperating landlord of a theatre, leased to an exhibitor of motion pictures for a minimal rental plus a specific portion of gross receipts, was outside the "target area" of the alleged conspiracy of distributors and exhibitors to restrain competition in the film exhibition business and had no standing to bring suit even though the landlord's tenant was allegedly a party to the conspiracy. This "target area" analysis was fully explained by the Second Circuit and we need not repeat that explanation here except to note that this Court also applies it in similar

situations. *See, e. g., Jeffrey v. Southwestern Bell*, 518 F.2d 1129, 1131 (5th Cir. 1975), *citing with approval, Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1296 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); *Mendenhall v. Fleming Co.*, 504 F.2d 879, 881 (5th Cir. 1974); *Martens v. Barrett*, 245 F.2d 844, 846 n.5 (5th Cir. 1957). *But see In re Multidistrict Vehicle Air Pollution M. D. L. No. 31*, 481 F.2d 122, 127 n.7 (9th Cir.), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). The Second Circuit did limit its holding, however:

> We do not suggest that a non-operating theatre lessor may never have standing to sue for treble damages under § 4 of the Clayton Act. If Calderone had alleged, for example, that the defendants had aimed their conspiracy at it, such as by agreeing to distribute and exhibit profitable pictures at theatres owned by the defendants or with which they had flat-lease arrangements, and not to distribute them to theatres with which they had percentage leases, Calderone would be in a different posture.

*Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d at 1296 n.3. The example the Second Circuit provided obtains here. Park Plaza Twin Theatres, Inc. alleged that the conspiracy was aimed at it; it was the alleged bull's-eye of the target. This alleged conspiracy was aimed at Park Plaza Twin Theatres, Inc. as an eventual, inevitable competitor in the motion picture exhibition business; damages to both the leasehold and the reversionary interest were alleged. This is not a case in which the plaintiff is incidentally injured only as a result of a relationship with the target of the conspiracy. Therefore, we must conclude that defendants' initial effort to avoid liability misses the mark. We hold that Park Plaza Twin Theatres, Inc. had standing to pursue a private antitrust action under 15 U.S.C.A. § 15.

materially contribute to the abandonment of the project.

**17.** Plaintiffs failed to refute this contention which defendants reiterated in their reply brief, drawing attention to plaintiffs' failure to join issue.

*Compare also Sandidge v. Rogers,* 256 F.2d 269 (7th Cir. 1958); *Melrose Realty Co., Inc. v. Loew's, Inc.,* 234 F.2d 518 (3d Cir. 1956), cert. denied, 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85; *Steiner v. 20th Century-Fox Film Corp.,* 232 F.2d 190 (9th Cir. 1956); *Harrison v. Paramount Pictures, Inc.,* 115 F.Supp. 312 (D.Pa.1953), aff'd, 211 F.2d 405 (3d Cir.), cert. denied, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1953). *See generally* 27 A.L.R.Fed. 866 and cases cited.

Second, defendants urge that the claim is nothing more than an attempt to obtain damages for loss of goodwill and, as such, is merely an effort to remedy Park Plaza Twin Theatres, Inc.'s omission to seek additional damages in its prior state court breach of contract proceeding against Gulf States Theatres of Texas, Inc. by seeking to recover three times the amount of damages omitted from the state court claim. The period within which the injury is alleged to have occurred is the same. The alleged cause of the injury is the same: the decision of Gulf States Theatres of Texas, Inc. to add screens to its own theatres and to play some of the best films at them rather than at the Park Plaza Twin Theatre. Indeed, the principal evidence relied on to show wrongdoing by the defendants was the judgment entered in the Texas state court.

■ Focusing on this sameness between the prior state contract suit and this federal antitrust suit, defendants argue that the Texas principle which forbids the splitting of a cause of action bars the claim of Park Plaza Twin Theatres, Inc. This principle prohibiting relitigation requires that a plaintiff bring in the first forum "every point which properly belongs to the subject of litigation, and which the parties, by exercising reasonable diligence, might have brought forward at the time." *Nichols v. Dibrell,* 61 Tex. 539, 541 (1884). *See also Freeman v. McAninch,* 87 Tex. 132, 27 S.W. 97 (1894); *Jones v. Hunt Oil Co.,* 456 S.W.2d 506, 514 (Tex.Civ.App.1970) (*writ ref.* n. r. e.). While the substantive law of the state controls in determining whether a cause of action has been improperly split in diversity cases, we apply federal law here in this federal antitrust suit. *Aerojet-General Corp. v. Askew,* 511 F.2d 710, 715, 717–18 n.9 (5th Cir. 1975). *See generally Green v. American Broadcasting Companies, Inc.,* 572 F.2d 628 (8th Cir. 1978), *Maher v. City of New Orleans,* 516 F.2d 1051 (5th Cir. 1975); *McConnel v. Travelers Indemnity Company,* 346 F.2d 219 (5th Cir. 1965) cited *in Wright, Law of Federal Courts* § 78 at 386 n.9 (3d ed. 1976). This may well be a distinction without a difference, since the Texas principle defendants invoke and the federal principle we apply are basically the same.

We need not repeat a scholarly exegisis of the principle prohibiting the splitting of a cause of action which may be found in the sources we cite; Professor Moore has distilled a definition as good as any other:

Normally, if a previous judgment is valid, final, on the merits, and on the same cause of action, it is an absolute bar in another action between the same parties or privies 'not only in respect of every matter which was actually offered and received to sustain the demane or to make out a defense, but also to every ground of recovery or defense which might have been presented.' This application of the doctrine of res judicata operates to prevent the splitting of a single course of action and the use of several grounds for recovery under the same action as the basis for separate suits. . .

[I]n accordance with public policy, partially to conserve the courts' time but probably in the main to prevent the hardship upon defendant of unnecessary piecemeal litigation, a single cause of action cannot be split so as to be properly made the subject of different actions . . . . .

1B *Moore's Federal Practice* ¶ 0.410 (notes omitted). *See generally Wright & Miller, Federal Practice and Procedure: Civil* § 1582.

■ Defendants' theory is that plaintiffs' Texas court suit for breach of the lease, *see Gulf States Theatres of Texas, Inc. v. Hayes,* 534 S.W.2d 406 (Tex.Civ.App.

1976), precludes this federal antitrust suit on the Park Plaza Twin Theatres, Inc. claim. We do not agree.

Initially, this Court's decision in *Norman Tobacco & Candy Company, Inc. v. Gillette Safety Razor Company,* 295 F.2d 362 (5th Cir. 1961), *affirming,* 197 F.Supp. 333 (N.D. Ala.1960), seems to support defendants' theory. There the plaintiff-wholesaler brought a civil antitrust action against the defendant-manufacturer based upon the defendant-manufacturer's alleged refusal to sell its products to the plaintiff-wholesaler. Based on an earlier completed breach of contract suit between the same parties in the same postures, in which the jury returned a verdict for the defendant-manufacturer, the district court entered a summary judgment which this Court affirmed. Because the "same severance of relationship" was the basis of each suit, this Court held "there was [but] one breach and one only and [plaintiff-wholesaler] has had its day in court and has lost. It cannot litigate [the] same breach again." 295 F.2d at 363–64. *See also Williamson v. Columbia Gas & Electric Corp.,* 186 F.2d 464 (3d Cir. 1950); *Bennett v. Commissioner of Internal Revenue,* 113 F.2d 837 (5th Cir. 1940).

This precedent has since been reaffirmed. In *Household Goods Carriers' Bureau v. Terrell,* 452 F.2d 152, 157 (5th Cir. 1971) (*en banc*) this Court noted: "it is well established that in a proper case one wrongful act may be the subject of two or more separate and distinct causes of action." The *res judicata* prohibition on splitting a cause of action is not violated by successive suits when "the invasion of two separate and distinct primary rights" has resulted from the same misconduct. In *Terrell,* the *En Banc* Court held the "personal right not to be subjected to libelous statements" separate and distinct from the "business right to enter competition freely." The *En Banc* Court thus distinguished prior precedents which held that *res judicata* barred plaintiffs from bringing a second suit based on

the same cause of action as an earlier suit. *Id.* at 157 n.11, *citing Norman Tobacco & Candy Co. v. Gillette Safety Razor Co.,* 295 F.2d 362 (5th Cir. 1961).

We view the instant case as being controlled initially by *Norman Tobacco & Candy Co.* Here, "the same severance of relationship" was the basis for both the state breach of contract suit and this federal antitrust suit: the alleged illegal conduct by the defendants in upgrading their competing theatres and downgrading the Park Plaza Twin Theatres. The facile notion that two separate rights are involved here, the right of a landlord to a lease without breach and the right of a competitor to be free from antitrust *animus,* was dispelled in *Norman Tobacco & Candy Co.* That case held that a breach of contract which allegedly violated the antitrust laws could not form the basis of two successive law suits. The *En Banc* Court reaffirmed this holding in *Terrell.* We are satisfied that the instant case is controlled, as we are, by these precedents. To conclude, as we have, that *Norman Tobacco & Candy Co. v. Gillette Safety Razor Co.* and *Terrell* are consistent, viable and here applicable does not require that we hold the instant case barred by the *res judicata* effect of the state breach of contract suit, however.

■ The prohibition against splitting a cause of action and the rather Draconian remedy of barring the subsequently filed suit must be applied with discretion and flexibility. In *Norman Tobacco & Candy Co.* the plaintiff brought the first suit, based on a breach of contract, in the federal court, a forum which was capable of providing the relief sought in the second suit, based on the federal antitrust laws and also brought in a federal court. In *Terrell,* the *En Banc* Court considered the libel suit and the private antitrust suit sufficiently distinct to distinguish the *Norman Tobacco & Candy Co. v. Gillette Safety Razor Co.* line of cases decided under the *res judicata* doctrine.[18] While we do not consider the state

---

18. The chief *res judicata* concern of the *En Banc* Court were evidentiary questions raised by the use of a letter from the libel suit in the

subsequent antitrust suit. 452 F.2d 157–59. The published opinions do not specifically say whether the prior libel action was brought in a

breach of contract suit and this federal private antitrust suit sufficiently distinct to distinguish *Norman Tobacco & Candy Company,* we find another basis for concluding that the later federal antitrust suit is not barred. ·

The principle of *res judicata* which prohibits splitting a cause of action "applies only to claims 'then capable of recovery' in the first action." *United States v. Pan-American Petroleum Co.,* 55 F.2d 753, 782 (9th Cir.), *cert. denied,* 287 U.S. 612, 53 S.Ct. 14, 77 L.Ed. 532 (1932). In this case, the first forum, the Texas state court, could not provide the relief sought in the second forum, federal antitrust damages. We hold, therefore, that this case was not barred by the splitting prohibition.

Since federal courts have exclusive jurisdiction over federal antitrust claims, the Texas [19] trial court did not have jurisdiction over the instant claim. 15 U.S.C.A. § 15; *Freeman v. Bee Machine Co.,* 319 U.S. 448, 451 n.6, 63 S.Ct. 1146, 87 L.Ed. 1509 (1943).

█ We have found no decision of this Court which applies the splitting prohibition to bar a second suit when the first forum lacked the ability to provide the relief sought in the second forum.[20] A plaintiff's

successfully suing in a state court on a claim that might have been but was not made the basis for state or federal antitrust relief does not bar a subsequent federal antitrust suit. The Court of Appeals for the Second Circuit suggested this rationale in *obiter dictum* contained in *International Railways of Central America v. United Fruit Company,* 373 F.2d 408, 418 (2d Cir.), *cert. denied,* 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967), citing the Restatement of Judgments § 62:

> Section 62k of the Restatement suggests that where the plaintiff sues in a court whose sovereign cannot or has not made available a court which can afford the plaintiff relief for his entire cause of action, there is no bar to a subsequent suit on the unredressed portion of that cause of action in the court of another sovereign which does afford such relief.

*Id.* at 418 n.18. *See Exhibitors Posters Exchange, Inc. v. National Screen Service Corp.,* 421 F.2d 1313, 1317 (5th Cir. 1970), *cert. denied,* 400 U.S. 991, 91 S.Ct. 454, 27 L.Ed.2d 439 (1971); *DeWitt Motor Company v. Chrysler Motors Corporation,* 391 F.2d 912 (6th Cir. 1968); *Cream Top Creamery v. Dean Milk Company, Inc.,* 383 F.2d 358 (6th

---

state or federal court. *See Household Goods Carriers' Bureau v. Terrell,* 417 F.2d 47 (5th Cir. 1969), *rev'd on rehearing en banc,* 452 F.2d 152 (1971), *after remand,* 494 F.2d 16 (1974), *cert. denied,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). Our own review of our own files discloses that the prior libel suit, which ended in a stipulation and from which the disputed letter came and which was never appealed, was brought in a federal forum. This point was of no moment to the En Banc Court since the libel suit and the antitrust suit were held to be sufficiently distinct as to avoid triggering the prohibition on splitting a cause of action. 452 F.2d 157. As we have observed, this approach is not available to us here. The fact that the prior libel suit was sued in federal court does not make *Terrell* inconsistent with the approach we take today, since the threshold determination, whether the rights invaded are separate and distinct, was resolved differently in *Terrell.*

19. We need not discuss the *res judicata* problems raised if the prior suit in state court is under the state antitrust statutes, though we conclude that the failure here to sue in the state court under state antitrust statutes is of no

moment. *See Woods Exploration & Producing Company v. Aluminum Company of America,* 438 F.2d 1286 (5th Cir.), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1971); *Blanchard v. Commonwealth Oil Co.,* 294 F.2d 834 (5th Cir. 1961). *Compare also Straus v. American Publishers' Ass'n.,* 201 F. 306 (2d Cir. 1912), *appeal dismissed,* 235 U.S. 716, 35 S.Ct. 197, 59 L.Ed. 438 (1914), with *Lyons v. Westinghouse Electric Corp.,* 222 F.2d 184 (2d Cir.), *on rehearing,* 222 F.2d 195, *cert. denied,* 350 U.S. 825, 76 S.Ct. 52, 100 L.Ed. 737 (1955).

20. *See Carr v. United States,* 507 F.2d 191 (5th Cir. 1975); *Woods Exploration & Producing Company v. Aluminum Company of America,* 438 F.2d 1286 (5th Cir.), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1971); *Seaboard Coast Line Railroad Company v. Gulf Oil Corporation,* 409 F.2d 879 (5th Cir. 1969); *Astron Industrial Associates, Inc. v. Chrysler Motors Corporation,* 405 F.2d 958 (5th Cir. 1968); *Acree v. Air Line Pilots Association,* 390 F.2d 199 (5th Cir. 1968); *Red Rock Cola Co. v. Red Rock Bottlers, Inc.,* 195 F.2d 406 (5th Cir. 1952).

Cir. 1967). We embrace this rationale here. The Texas state court had no jurisdiction to consider the alleged federal antitrust violations arising out of the breach of the lease. Therefore, we hold that the state court suit is not a *res judicata* bar to this federal antitrust action. *See also Towle v. Boeing Airplane Company,* 364 F.2d 590 (8th Cir. 1966); *Engelhardt v. Bell & Howell Co.,* 327 F.2d 30 (8th Cir. 1964); *United States v. Temple,* 299 F.2d 30 (7th Cir. 1962); *Howard v. Chicago, B & Q R. Co.,* 146 F.2d 316 (8th Cir. 1945), *cert. denied,* 324 U.S. 879, 65 S.Ct. 1028, 89 L.Ed. 1431 (1945); *Davis v. Towe,* 379 F.Supp. 536 (E.D.Va.1974), *aff'd,* 526 F.2d 588 (4th Cir. 1975); *International Prisoners' Union v. Rizzo,* 356 F.Supp. 806 (E.D.Pa.1973).

Defendants next assert that the alleged conduct which forms the basis of the Park Plaza Twin Theatre, Inc. claim cannot be considered an antitrust violation.

Of course, defendants are correct to argue that an entrepreneur is not protected from competition on the merits— "the *summum bonum* of the Sherman Act." *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 848, 851 (5th Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976); *Panotex Pipe Line Co. v. Phillips Petroleum Co.,* 457 F.2d 1279, 1289 (5th Cir.), *cert. denied,* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 86 (1972). The general purposes of the antitrust laws are advanced when competition increases. *See John Wright & Associates, Inc. v. Ullrich,* 328 F.3d 474, 480 (8th Cir. 1964); *American Football League v. National Football League,* 323 F.2d 124, 131–34 (4th Cir. 1963); *Denison Mattress Factory v. Spring-Air Co.,* 308 F.2d 403, 408 (5th Cir. 1962). *See also Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Clark Marine Corp. v. Cargill, Inc.,* 226 F.Supp. 103, 111 (E.D.La.1964), *aff'd per curiam,* 345 F.2d 79 (5th Cir. 1965), *cert. denied,* 382 U.S. 1011, 86 S.Ct. 620, 15 L.Ed.2d 526 (1966). There is an obvious answer to the defendants' assertion that the antitrust laws do not countenance such a claim: the cases cited and discussed above concerning the stand-

ing of a landlord-owner to sue the lessee and its coconspirators have already recognized the viability of such a theory. On these same cases, we depend. This claim is more than just an allegation of increased competition. The plaintiffs' theory of antitrust injury posited a successful conspiracy by the lessee and competing theatres to downgrade the Park Plaza Twin Theatre and upgrade their own operations to eliminate competition from Park Plaza Twin Theatres, Inc.

Despite all that has been written upholding the theory of the Park Plaza Twin Theatre, Inc. claim in the face of defendants' appellate attack, we must, nonetheless, reverse. Ironically, plaintiffs have themselves highlighted the reason for our reversal and remand for retrial:

> Not until the state court judge ordered that the lease be cancelled and the defendants by supersedeas bond remained in possession and continued to operate the Park Plaza [Twin Theatre] in the same destructive manner, did it become apparent the defendants' actions toward the Park Plaza [Twin Theatre] were part of the overall conspiracy involving Mid-County [Enterprises, Inc.] and the shopping center-theatre.

Brief of Appellee at 46. We have already explained at considerable length why the claim of Mid-County Enterprises, Inc. and the shopping center claim must be reversed and remanded with instructions to dismiss. Though the Park Plaza Twin Theatres, Inc. claim does have its own separate theoretical viability as an antitrust claim, the theory of plaintiffs' case hinged the claim to an overall conspiracy which they failed to prove. Despite the use of the jury interrogatories, the very real likelihood that the jury may have utilized an unproven or improper theory of liability to reach its verdict mandates reversal. *See Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.,* 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962); *Yoder Bros. Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, (5th Cir. 1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); *Russell v. City Ice &*

*Fuel Co.,* 539 F.2d 1318 (4th Cir. 1976); *Rea v. Ford Motor Co.,* 497 F.2d 577 (3d Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). Thus, the Park Plaza Twin Theatre, Inc. claim is reversed and remanded for new trial.[21]

### IV.

In summary: the shopping center claim is reversed and remanded with instruction to dismiss; the Mid-County Enterprises, Inc. claim is reversed and remanded with instructions to dismiss; the Park Plaza Twin Theatre, Inc. claim is reversed and remanded for a new trial.[22]

REVERSED and REMANDED.

---

21. To hold, as we do that this federal antitrust suit is not barred by the prohibition against splitting a cause of action does not end our concern with *res judicata,* however. The related concept of collateral estoppel bars relitigation of the same facts or issues that were necessarily determined in the prior proceeding. *See* 1B *Moore's Federal Practice* '' 0.405, 0.441(2); *Carr v. United States,* 507 F.2d 191 (5th Cir.), *cert. denied,* 422 U.S. 1043, 95 S.Ct. 2657, 45 L.Ed.2d 694 (1975); *Household Goods Carriers' Bureau v. Terrell,* 452 F.2d 152 (5th Cir. 1971) (*en banc*); *International Rys. of Central America v. United Fruit Co.,* 373 F.2d 408 (2d Cir.), *cert. denied,* 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967); *Seaboard Air Line Railroad Company v. George F. McCourt Trucking, Inc.,* 277 F.2d 593 (5th Cir.

1960). *Howard v. Chicago B & Q R. Co.,* 146 F.2d 316 (8th Cir.), *cert. denied,* 324 U.S. 879, 65 S.Ct. 1028, 89 L.Ed. 1431 (1945). Since we remand the Park Plaza Twin Theatre, Inc. claim to the District Court, consideration of the collateral estoppel doctrine is best left to the proceedings on remand and we need not consider it here.

22. Defendants other claimed errors need not be addressed here. We have already made this opinion and appeal longer than usual: "I have made this letter longer than usual because I lack the time to make it shorter." Pascal, *Provential Letters* XVI. Of course, the award of attorneys' fees should be set aside on remand.